The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. All right, Mr. Anderson, I'm pleased to hear from you. Good morning, Your Honors. Howard Anderson on behalf of Mr. Peterson, and here at the council table is counsel for Mr. Bunn, Carlisle Steele. As Your Honors know, this is a media appeal for most of what I filed, but we had a lot going on for two different cases at the trial court. So in total, we have six issues. I'll list the issues and then address them in whatever order, Your Honors, I would care to hear. I think it's up to you. Okay, well then, Judge, I guess I'll start with, to me, the most interesting issue, which is the IADA and the government's failure over the course of at least 22 years, and I think perhaps even during the entire existence of the IADA, to ever have lied with it in South Carolina. This case presents the opportunity to vindicate the IADA at a minimal cost to the public, given the lengthy sentence that my client is serving and given the life-without-parole sentence that Mr. Steele's client is serving. And so if there is ever a case in which a district court should exercise its discretion to dismiss an indictment with prejudice, I would submit that it's this case, given, one, the 22 years of the constant violation, two, given that I had obtained an order requiring my client to stay in federal custody. Tell me again who your client is. Mr. Peterson. Mr. Peterson, okay. And the Marshal Service disregarded the order. Now, the testimony at the hearing was that they didn't read it. I submit to Your Honor that if I were to go into court and say to a judge that I just didn't bother to read the ECF entry that came out, I would have a very short stay there in the courtroom. But I understand that the Marshal Service has a special place at the courthouse. I thought Mr. Peterson was transferred to accommodate his counsel. Judge, I asked him to be transferred into federal custody as required by the IADA. And, Judge, in my motion I said he is 180 miles away from my office. But I said that the IADA says he's supposed to be in federal custody, which is where I wanted him, because I would have better access to him under all the circumstances. Right. If he was transferred back to state custody. Correct. Because at the county jail where the Marshal's house pretrial detainees, I can go visit on weekends. I can go visit after hours. And as a solo practitioner, that's when I do most of my clients. So you wanted him to be transferred. I wanted him to be transferred into federal custody as required by federal law, yes. And I wanted him to stay there. And you what? And I wanted him to stay in federal custody. I did not want him to go back to the Department of Corrections. Well, then, I'm not sure how you can make an argument about problems with the IADA. But, Judge, the IADA says once he comes into federal custody, he's supposed to stay there. And you wanted him to stay there. And I wanted him to stay there. Emphatically, I wanted him to stay there. But the Marshal sent him back to SEDC in violation of the IADA and in violation of orders. I thought he went back to, what is it, PCI? Apparent Correctional. It's a SEDC facility that's closer to my office than was his original SEDC facility. Right. But I thought that the effort was made to transfer him to state custody so that he could, to accommodate the lawyer's request that he be housed locally in order to facilitate attorney-client communication. Judge, in my motion to the district court, I said the IADA— You can't run hot and cold on this. Judge, I don't think that I am. I was emphatic that I wanted him to go into Marshal's custody. Marshal's custody would have resulted in him being housed— No, but what they were trying to do was accommodate a request that you had made. Well, Judge, my request was for them to follow federal law. And federal law says he's supposed to stay in Marshal custody. If they hadn't transferred him, you would have probably complained about that. No, Your Honor. I wanted him in the county jail, which is where the Marshal's house is pre-trial. Well, if they hadn't accommodated your request, you would have had a Sixth Amendment claim, which is that they interfered to an extent with a free flow of attorney-client communications. Judge, if they hadn't accommodated my request, my claim would still be under the IADA that he's supposed to be in Marshal's custody. And Marshal's custody in our district means he's going to be either in my county or in Spartanburg County. Maybe so, but at the end of the day, the IADA reserves the question of prejudice to the district judge. And I don't understand why the length of your client's sentence or why the length of Mr. Bynes' sentence would bear on the question of whether the district judge abused his discretion. The district judge felt that the lengthy sentences supported his decision to dismiss the indictment without prejudice. Well, Judge, I would say that in my mind, I guess one, Judge Kain didn't really address that argument that I made, so I don't know exactly what his thought was. But my argument to him at the time was... But how does a district judge abuse his discretion when he decides to dismiss without prejudice because very serious crimes have been committed? Well, Judge, the seriousness of the crime is one of the factors that the judge has to consider. And I agree that these crimes are serious given the sentences that are available to them. So I agree that that factor weighs in favor of the government. But, you know, the basis of your appeal is you're attacking one after another after another of decisions that are basically consigned to the discretion of the district court. And this is certainly a big one. And another factor was the district court, I think, found that the transfer to state court was not going to interrupt any kind of receipt of rehabilitation services. It wasn't going to be disruptive in terms of anybody's rehabilitation. In other words, I thought it was a multifactored analysis. Yes, Judge. The statute lists three factors that the judge must consider, and then it also says, and any other irrelevant facts and circumstances. And so one of the factors is the seriousness of the offense, which I agree weighs in favor of the government. The other two factors are the circumstances of the violation, which, in my mind, definitely weighs in my favor given, as the Pope case says, if it's a systematic problem, that weighs in favor of a dismissal with prejudice, which here was more than 22 years. The marshals had never complied with the statute. And given that I had a court order that he stay in federal custody, and the marshals sent him back to state custody anyway in violation of the court order. And I think that violation of the court order at least means that that factor weighs in my favor. Now, if Judge Kain had said, well, Howard, I think that the seriousness is more important than factors two and three that weigh in your favor, that would be a much different argument here. But my argument is that his analysis was not complete because he didn't address all of the issues that I raised. Okay. And under an abuse of discretion. Excuse me. I'm sorry, Judge. Looking down the road, if you say there was an abuse of discretion in dismissing without prejudice, you really are tying the hands of the marshal service and the courts. Because there may be times, as in this case, where depending on the location of federal and state facilities, where it actually might be more favorable to the presentation of a good defense to have the lawyer and the client closer together. I mean, the whole purpose of the with or without prejudice analysis or provision in the statute is to preserve flexibility in a case like this without imposing the draconian consequence of a dismissal of an indictment with prejudice. And, Judge, some of the defendants in this case, when it was re-indicted, chose to go back to SEDC because they decided it was better for them to be in SEDC than to be in Marshall's custody. And so I would submit that that flexibility is still there, that if I think that it's better for my client to be in SEDC, I can say, Judge, we are willing to waive our congressional rights to remain in Marshall's custody for whatever reason. My client likes the food better or whatever. That's a right that he would have to waive his rights. The Supreme Court's clear that a defendant can waive his rights if he wants to. But here the point is that he's supposed to remain in federal custody unless and until there's an order sending him to state custody. And that was not done here. So our review here is for abuse of discretion, right? Yes, Your Honor. Okay. The other issue that we have is under the Speedy Trial Act as to when a superseding indictment must be returned. Aren't the circuits fairly uniform in saying that the superseding indictment is not subject to the 30-day limitation when the original indictment was filed within the 30 days? I would agree that the weight of authority is against me on the issue, but I think that the plain language of the statute weighs in favor of me on this issue. Well, but we would be going against a great number of circuits. And if you say that a superseding indictment has to be filed within 30 days, you're going to get overcharged. I think that was on the minds of the other circuits when they say, well, we can't file a superseding indictment. We're just going to throw you in the kitchen sink on the original indictment and maybe have some of the charges dismissed on plea bargaining or drop some of the charges later on. But if you put those restrictions on a superseding indictment, you're going to have a lot of overcharging up front in the original indictment. And I can't see how that serves the interest of accuracy or anything else, because it's the filing of the original indictment, really, that gets the ball rolling. Which was, I think, the concern of the Speedy Trial Act was not to have somebody just languishing before any formal judicial action or presentation of charges took place. Well, Judge, I would say that, you know, when I read... That's what the other circuits are saying. Right, they are looking at policy rationales, et cetera. And what I am looking at is the plain language of the statute that says any information or indictment shall be filed within 30 days. And I think any means any. And the indictment was filed within 30 days. Well, Judge, the government wants to say that the statute means that the first indictment shall be filed within 30 days. And I submit that that's a different statutory text than any information or indictment shall be filed within 30 days. And so I've cited a couple of district court cases that say the plain language says you can't have superseding after more than 30 days because that's not what the statute says. The other issue also about the IADA was about how we count time. Do we count time the same way that we counted under the Speedy Trial Act or do we count it sort of under calendar days? I would say that if we're going to adopt a rule that all of the exceptions in the Speedy Trial Act also apply to the IADA, that's a problem. One, because the IADA came four years first. But then secondly, the IADA is also adopted by 48 states. You know, one of the things that's important in these Speedy Trial Act cases and IADA cases is to try to maintain a uniformity of practice across the country with respect to these kinds of things and not having a patchwork. And again, the other circuits have held, as I understand it, that the STA and the IADA time limits were largely congruent. And in response to that, I would just say that the Supreme Court in Morrow specifically contemplated that you would have two different deadlines under the Speedy Trial Act and the IADA. But I think of the government's view, there would be no way for there ever to be two different time limits. Well, in this case under the IADA, a lot of the periods of delay were caused by your own motion. And those are not in the Speedy Trial Act or the IADA is told for those sorts of motions. Judge, I would agree that under the Speedy Trial Act the clock stopped, but I would disagree that Mr. Peterson and Mr. Bond were unable to proceed. I'm sorry, my time is up. If I can answer briefly your question. Okay. There is nothing in filing the motions that would have prevented the trial from happening. As I view it, the acting inconsistent with the deadline says, I don't want the trial to happen on April the 7th, I want it to happen on May the 7th. There is nothing that would have prevented Judge Payne from ruling faster than he did, from taking the motions under advisement pending the jury trial. There's nothing that our clients ever did that sought to delay the trial date. But the very fact that there are a bunch of motions filed, if you want the district court to carefully consider them, I understand that you didn't say, I want a new trial date, but you did want him to consider and rule on all these things, right? Yes, Judge, and it's possible for the court to take it under advisement pending the trial. Sure, sure, and it's possible that he had other, it's possible anyway that he had other cases. Yes, Judge, but I would say that, just like under the Speedy Trial Act, that court congestion is not a grounds for holding things under advisement for more than 30 days. It's not Mr. Peterson's fault if Congress hasn't approved enough funds for judges to have a manageable caseload. That's a fault of Congress, not of our clients. I thank you. Thank you, sir. Ms. Stoughton? May I please support a case on behalf of the United States? Your Honor, this is an unusually complex case involving 17 defendants, a bi-coastal methamphetamine trafficking ring, over 50,000 pages of discovery, and a very active motions practice on the part of multiple parties from the very beginning of the case. The appellants have taken issue with the district court's exercise of discretion in numerous respects. They are unable to point to any clear error of fact or mistake of law that would warrant vacating their convictions. With respect to the first issue, the district court's dismissal of the original indictment without prejudice, it's the government's position that only Mr. Peterson has standing to challenge this order. The district court found that there was no IADA violation with respect to Mr. Bunn. Therefore, the dismissal of Mr. Bunn's case is pursuant to Rule 48A and not under the IADA at all. As to Mr. Peterson's arguments, the IADA lays out three statutory factors that the district court must consider when the IADA's anti-shuttling rights have been violated. In this case, the district court issued a written order in which it thoroughly and properly considered each of the three factors and decided that each weighed against dismissing the case for prejudice. It's our position that there was no abuse of discretion in the district court's order. Does the Marshal's Office have a new recognition of this statute? Absolutely, Your Honor. Both the Marshal's Service in South Carolina and the U.S. Attorney's Office do. We have trained our AUSAs and the Marshal's Service about anti-shuttling provisions. We've instituted a standardized waiver that we now present to every defendant who is serving an active state sentence at their first appearance in federal court. So they're given the opportunity to either waive their anti-shuttling rights and be returned to state custody or to remain in federal custody pending the outcome of the proceedings. We've also asked the Marshal's Service to notify our criminal chief in any case where a detainer is lodged against a defendant serving a state sentence so that we are on notice that that person's IADA anti-shuttling rights have been triggered. Have you shared this with other U.S. Attorney's Offices? In passing, I have with the Western District of Virginia. It seems like it's an issue that they've encountered. You just might, I don't know how much, but it would be a shame to have this same issue come up again since now you are in a good position to tell them the problems that arise. We are happy to spread the message, Judge Mons. With respect to a couple of contentions that counsel made about the district's failure to comply with the magistrate judge's order that Mr. Peterson be retained in federal custody, if I could just point the court to a couple of salient portions of the joint appendix. The first is on JA-302. The magistrate judge, as the court has noted, issued its order on November 14th in response to counsel's concern that his client was housed 180 miles away from him and that made any sort of meaningful attorney-client relationship difficult. On November 17th, so three days after that order was issued, Mr. Anderson emailed court personnel and the attorney for the government and said the U.S. Marshals Service has made arrangements for Mr. Peterson to be brought up to Perry, which is a state facility, today and to have SCDC keep him there for the indefinite future. At the 1130 pretrial, I proposed to ask Judge Payne to approve that placement subject to the availability to revisit the issue. Further, at JA-468 through 470 and then again at JA-493, Deputy Marshal Bond, who is a supervisory deputy marshal, testified that he received the magistrate judge's order on November 14th and given Mr. Peterson's disciplinary record in the Department of Corrections, he was concerned that the Marshal Service may not be able to safely house Mr. Peterson in a local facility pending the outcome of the federal proceedings. So, Deputy Marshal Bond reached out to the magistrate judge and asked, would it be okay if they talked to SCDC about having Mr. Peterson moved to an SCDC facility in the upstate? So, everything in the record shows that the magistrate judge, the court personnel, and the deputy marshals were all just trying to cater to counsel's concerns that his client was housed too far away from him. There was certainly no disregard of the magistrate judge's order. Deputy Marshal specifically testified that he thought moving Peterson to Perry satisfied the court's order to have Mr. Peterson moved. Going back to Judge Mott's question, can you tell me how long ago you made those changes? I know that this case was the first where it was ever alleged that we violated IADA's anti-shuttling rights. The district immediately embarked with the Marshal Service and with several of the members of the district court, including the chief judge. I'm not sure of the date at which that came. How about approximately? Well, certainly by the time this case was re-indicted, which would have been February of 2017, at the re-indictment, these defendants were presented with the opportunity to waive their IADA anti-shuttling rights or to remain in federal custody. If I could move just briefly, Your Honors, to the three evidentiary issues that Mr. Peterson has raised. It's our contention that none of these issues were an abuse of discretion on the district court's part, but even if any one or all three of them were error, that any such error would be harmless. We have overwhelming evidence in this case that connected Mr. Peterson to conspiracy overall and to the July 22, 2014, methamphetamine purchase in particular. So it's our position that any such error on the evidentiary issues would be a harmless error. What about Mr. Peterson's request that he be allowed to impeach defendant Bunn with Bunn's federal conviction and life sentence? Well, Your Honor, the original request was to impeach Bunn with evidence of the conviction and the life sentence. The district court determined that under the plain language of Rule 609A1B, that only evidence of the conviction would have been appropriate. The rule does not provide for impeachment by evidence of a sentence. We do not believe that that ruling was an abuse of discretion. Once the district court determined that evidence of the sentence was not going to come in, that he would only allow the jury to know about the felony conviction. That would have put Mr. Bunn in a bad way. It did. And Mr. Bunn objected five separate times in the span of four pages of the transcript. So Mr. Bunn objected strongly to having that? He did, Your Honor. And in light of Bunn's objections, the district court's ultimate ruling was that the danger of prejudice to the presumption of innocence to Mr. Bunn by admitting the evidence of the prior felony conviction was so great that the danger of unfair prejudice outweighed any probative value to Mr. Peterson. That's on JA 1863 and 64. We believe that that comports fully with the rule, the standards set forth in Rule 609A1B, and that there was no abuse of discretion. With all of these, I mean, all of these things are discretionary decisions. And this struck me as a case where you had a substantial amount of evidence coming in. Yes, Your Honor. As I noted, there were over 50,000 pages of discovery turned over to defendants. How long did the trial last? It was five days. Five days? Yes, Your Honor. Only two of the defendants ultimately went to trial, and so of the conspiracy, we chose the most salient witnesses to be tied, Mr. Peterson and Mr. Bunn. You had a lot of co-conspirator testimony? Yes, Your Honor. How many? I believe at least three testified at the trial. It may have been more than that. But all of them were extensively cross-examined on their potential bias, their motivations for testifying. Still, the jury found the defendants guilty of all charges against them. If Your Honors have no further questions, we're happy to rest on our briefs on the second and third issues. And we'd ask that this Court affirm the District Court's conviction of Mr. Bunn and Mr. Peterson. Thank you. Mr. Anderson. Thank you, Your Honor. As to the issue of harmlessness, I would disagree with the government about the weight of the evidence here. There was a lot of co-conspirator testimony, but it was not directed towards Mr. Peterson. The only evidence about Mr. Peterson were these text messages that the officer said that she didn't know who was sending them. You then had Mr. Martin, who said that Mr. Peterson was the voice on the other end of the call, but he had previously falsely accused someone. You had Mr. Davis, who was a co-conspirator, who said that my client had this jailhouse confession right before trial, but that's it. All of the other co-conspirators, I asked them, have you ever met Mr. Peterson, know anything about him? They all said no, no, no. So while the trial itself was five days. So what are you complaining about? Judge. Are you complaining about the fact that you didn't have an expert to demonstrate that text messages can be fabricated? I guess my point was that it's not harmless error if you find an error. I thought your point was that there wasn't sufficient evidence. You said the government says there's a lot of evidence, but then I thought that's what you were saying. That's a pretty hard argument to make, so maybe you're not making that argument. No, Judge, I am not challenging the legal sufficiency of the evidence, but saying that harmless error, if you find an error, doesn't apply because the evidence was not overwhelming as to guilt. The only evidence tying Mr. Peterson to the conspiracy are two witnesses and then these text messages that people say they don't know who sent them. Okay, but then that leads you to Judge Wilkinson's question. So what is this error? What is the error that you think was not harmless if it was an error? The three evidentiary errors that I have identified in the brief, the first one was about the text messages. There was no – Is this the demonstration one? Yes, Judge. I guess, Judge, that I think that I should have been allowed to ask the government or to tell the jury that you fabricated these messages. Was there any evidence that the messages, these particular messages, as opposed to text messages in general, were fabricated? The only evidence was that one of the witnesses – Otherwise, it's just speculation. One of the evidence – one of the witnesses testified that text messages – that there's services that can disguise the phone number. I come to know it was one of the law enforcement agents who testified as to that. Didn't you have an opportunity to cross-examine the agents? Yes, I did, Judge. And did you ask them whether any of these messages were false? The agents who sponsored them, no, I did not ask them at the time. But I don't think – That would have kind of laid the groundwork for this kind of argument, wouldn't it? Judge, I don't think that I am limited as to when I get – You didn't say that. I asked you if you'd done it, and you said no, you didn't. Right. And then I asked you – that would have been if, for example, they said yes, then you might have a stronger argument about this demonstration, right? I suppose so, yes. But as a matter of trial strategy, I didn't ask those two agents at the time. Right. That I wanted to do this demonstration. Well, did you have some other witness that would show that the demonstration would be relevant to these particular text messages? Did I have another witness? You didn't use – you didn't do cross-examination of the officers, and so Judge Wilkinson was asking you about whether the falsity of text messages was relevant to these text messages. And so it seems to me you have to have something that connects possible falsity in the world of text messages to the text messages here. So that's why I was suggesting if you'd ask the officers so that you would make that bridge. So did you have another witness that suggested that? Judge, no, I didn't have any specific evidence that these messages were, in fact, falsified. But they're able to come in once the proponent makes a prima facie case that they are what they purport to be. And so that's how they came in, to get in front of the jury, right, because it's a prima facie case. But I wanted to have this evidence to then have the jury say, well, we're not convinced beyond a reasonable doubt that these messages are what the government says that they are. And I wanted to ask the FBI's tech person about this issue. But Judge Kaine said, no, I couldn't do the demonstration. And so that's how that came up. As to the issue about Marshall Bond, I will note that while he did talk to the magistrate, I wasn't keyed in on that conversation. And so I wish that Marshall Bond had keyed me in before he talked to the magistrate about it so that I could have been heard before that happened. But I appreciate the panel's time today. Thank you. And I see that you're court appointed. And I want to express the court's appreciation for your services. Both me and Mr. Steele, Your Honor. Oh, I would like to express both appreciation for both your services. Thank you, Judge. We'll come down and greet counsel and move into our next case.
judges: J. Harvie Wilkinson III, Diana Gribbon Motz, Henry F. Floyd